**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| BARRY H. DAYTON,<br><br>individually and on behalf<br>of all others similarly situated<br><br>       Plaintiff,<br><br>       v.<br><br>OAKTON COMMUNITY COLLEGE,<br>MARGARET LEE, JOIANNE SMITH,<br>MICHAEL ANTHONY,  KARL<br>BROOKS, MAYA EVANS,<br>TOM HAMEL, COLETTE HANDS,<br>BONNIE LUCAS, and MUM<br>MARTENS.<br><br>       Defendants. | No. 1:16-cv-06812 |

**PLAINTIFFS' BRIEF IN SUPPORT OF**
**COLLECTIVE AND CLASS CERTIFICATION**

Nathan D. Eisenberg (Ill. Bar No. 6307413)
nde@previant.com
Sara J. Geenen
sjg@previant.com
THE PREVIANT LAW FIRM, S.C.
310 West Wisconsin Ave. Suite 100 MW
Milwaukee, WI   53203
Telephone: 414/271 4500
Fax: 414/271 6308

Stephen Yockich (Ill. Bar No. 6181707)
syokich@laboradvocates.com
Dowd, Bloch, Bennett, Cervone, Auerbach &
Yokich
8 South Michigan Avenue – 19th Floor
Chicago, IL  60603
Telephone:  312/ 372-1361
Fax:  312/372-6599

Attorneys for Plaintiffs

## INTRODUCTION

Plaintiff Barry Dayton seeks collective certification of his claims under Section 7(b) of the Age Discrimination in Employment Act, 29 U.S.C. § 626(b), and class certification, pursuant to Fed. R. Civ. P. 23, of his claims under 42 U.S.C. §1983 and for violations of Illinois Const., Art. XII, §5. Oakton Community College, its President, and the President's Council promulgated and implemented a policy of not employing as faculty any individual who is an annuitant of the State University Retirement System ("SURS"; and "the Policy"). The Policy not to employ SURS annuitants after July 1, 2015 was not based on annuitants' job performance, class schedule, or availability to teach classes. (Amended Requests to Admit No. 7, 8).[1] Instead, Dayton alleges that the Policy was solely based on faculty members' status as annuitants, discriminates against employees 40 years of age and older because it has a substantial disparate impact on the class protected by the ADEA, and retaliates against putative class members for participation in SURS in violation of the Illinois Constitution Art. XII, sec. 5.

By this motion, Dayton seeks to include in the ADEA collective class and Rule 23 class "All part time and adjunct faculty who were denied employment at Oakton Community College as the result of its policy to not employ or re-employ State Universities Retirement System annuitants and who are not 'affected annuitants' pursuant to 40 ILCS 5/15-139.5(b)(2)." Dayton requests that the Court certify both classes and approve notice to class members.

## MATERIAL FACTS

Oakton Community College ("College") is a two-year community college with campuses in Des Plaines and Skokie, Illinois. (Docket No. 20, Answer ¶10). The College's instruction is carried out by full-time, part-time and adjunct faculty. (*Id.* at ¶21). Faculty who teach a course-

---

[1] All record citations are to documents attached to the simultaneously filed affidavit of Nathan D. Eisenberg.

1

load of 27 Lecture Hour Equivalents (LHE) per academic year or less are "adjunct," while those who teach six or fewer LHE per year are "part time." (Ahrndt Tr. 37-38, Ex. 4 at 11; Martens Tr. 29). A collective bargaining agreement ("CBA") between the College and the Oakton Community College Adjunct Faculty Association ("OCCAFA") specified the compensation, terms, and conditions of adjunct faculty employment. (Hamel Tr. 120; Arndt Tr. 36, 40-41, 67). Although not covered by the CBA, other part-time faculty were paid according to the OCCAFA CBA. (Ahrndt Tr. 12, 36, 43).

Adjunct and part-time faculty include individuals who retired from their previous employment with a state university and began to draw an annuity from SURS ("annuitants"). (Ahrndt Tr. 16-17; Ans. ¶20). Illinois' longstanding "Return to Work law," 40 ILCS 5/15-139, prohibits annuitants from collecting their SURS annuity if they exceed an annual "earnings limitations" in post-retirement employment.[2] Individuals who began collecting an annuity before age 60 were limited to earnings equal to their monthly base annuity; those who retired at or after age 60 cannot exceed their highest pre-retirement academic-year earnings. (Ex. 2). Employers played no role in determining if annuitants exceeded their earnings limitations, and were only required to inform SURS of annuitants return to work, length of employment, and pay rate. (*Id.*)

In August 2012, the Illinois Legislature passed Public Act 97-0968, the Biss Act, which added a new earnings limitation to the Return to Work law. (Ex. 2). Under the amended law, annuitants become "affected" if they earn compensation from employment with a SURS-contributing employer that exceeds 40 percent of the annuitant's pre-retirement highest annual rate of earnings. 40 ILCS 5/15-139.5. Employers are responsible for paying the annuity of any

---

[2] References to annuitants, employers, employment and earnings herein are specific to SURS and SURS-contributing employers; annuities from, and earnings and employment with non-SURS employers are not relevant to earnings limitations or whether an annuitant becomes "affected" under the Biss Act amendments.

affected annuitant they employ, beginning in the academic year *after* the annuitant exceeds the 40% earnings limitation. (Martens Day 2 Tr. 17; Ahrndt Tr. 27). Although separate from one another, both earnings limitations apply. (Martens Day 2 Tr. 16-17).

After August 1, 2013, SURS required employers to determine their employees' status as annuitants prior to employees beginning their 2013-2014 academic-year employment. (Ahrndt Tr. 24-25). The College tasked Craig Ahrndt, assistant to the chief human resources officer, tracked annuitants' course loads for compliance with the Return to Work law. (Ahrndt Tr. 12, 53). Mercedes Lizalde, a human resources specialist, began monitoring annuitants' earnings in spring or summer 2013. (Lizalde Tr. 20).

To aid the College in complying with the 40% limitation, SURS provided the College with a list of annuitants and their highest pre-retirement annual rate of earnings in March 2013. (Ahrndt Tr. 18; Martens Day 2 Tr. 20-21, Ex. 6). From this list, Ahrndt created a spreadsheet that contained the old Return-to-Work Act earnings limitation and the 40% limitation. (Martens Day 2 Tr. 20-21; Ahrndt Tr. 51-53, Ex. 5). The College also required that annuitants who retired or were hired after March 2013 provide a SURS certificate of retirement annuity to maintain their employment and allow the College to determine each employee's earnings limitations. (Ahrndt Tr. 40-41). The SURS spreadsheet subsequently formed the basis of several reports created by Ahrndt and Lizalde. (Ahrndt Tr. 47; Martens Day 2 Tr. 5, 20-21).

In July 2013, the College, by Ahrndt, sent its annuitant-employees a form letter that addressed earnings limitations and monitoring as a result of the Biss Act. (Ahrndt Tr. 22, 25, Ex. 2). For each annuitant, the letter identified both the earnings limitation under the old law and the Biss Act's 40% limitation. (Ahrndt Tr. 25-27; *See*, e.g. Ex. 1, 2). The letter explicitly stated that "the two return to work laws work independently from one another." (Ex. 2). In September 2013,

3

the College resent the letter to all annuitants who failed to provide certificates of retirement annuity. (Martens Day 1 Tr. 36).

Almost immediately, the College identified three annuitants whose expected earnings would (and did) exceed the 40% earnings limitation, causing them to become "affected" in the following academic year. (Martens Day 2 Tr. 52). Because it did not want to incur penalties for employing affected annuitants, in October 2013, the College notified all managers, supervisors and administrators that beginning the Fall 2014 semester, it would not employ any annuitant "affected" under the Biss Act. (Ex 13).

Ahrndt and Lizalde tracked annuitants' earnings throughout the 2013-2014 academic year. Lizalde was specifically responsible for identifying the appropriate limitations on earnings for each annuitant and comparing those limitations with employee earnings. (Lizalde Tr. 23-24, 35-37). However, the spreadsheet she created in January 2013 that specified employees' earnings limitations failed to include the 40% calculation for some annuitants, and instead only included the overall earnings limitation. (*Id.*, Ex. 12). As a result, Lizalde's monitoring of annuitants' earnings failed to take into account the Biss Act's 40% earnings limitation for annuitants who retired before age 60. (Lizalde Tr. 34-35). In August 2014, Lizalde sent an email to all Oakton employees which failed to include the Biss Act's 40% limitation. (Ex. 29).

Lizalde's calculations were sent to all departments and divisions within the college so that department heads could take the limitations into consideration when scheduling faculty's course loads. (Martens Day 2 Tr. 23). Since Lizalde was not correctly calculating the limits, that same mistake would be repeated to every department or division she sent the calculations to. (*Id.* at 23, 59-60).

4

To avoid penalties under the Biss Act, the College needed to ensure that as of September 1, 2014[3] it was not employing any affected annuitants, including annuitants who became affected during the 2013-2014 academic year.  It did not. There was a two-week gap in instruction following the end of the 2013-2014 summer sessions and the beginning of the 2014-2015 academic year. (Lee Tr. 56; Martens Day 2 Tr. 15-16). In addition, the College could have consulted its payroll system to determine all earnings paid to faculty during the academic year. (Martens Day 2 Tr. 6-8). However, the College never compared the part-time and adjunct faculty's earnings against the 40% earnings limitations presented by the Return to Work law during this two week grace period. (Lizalde Tr. 96). After the new academic year began, in mid-September, Lizalde used a 2013-2014 payroll earnings report to determine that two individuals had exceeded their limitations, at which point she and Martens determined that those individuals remained employed by the College. (*Id.* at 41).

In October 2014, when Lizalde reported annuitants' 2013-2014 academic year earnings to SURS, she encountered a problem when entering the certain adjunct faculty members' earnings information. Lizalde contacted SURS to ask "Why is the 40% an issue? It [sic] this employee considered an affected annuitant even though he did not exceed his monthly earnings limitation?" (Lizalde Tr. 36-37, Ex. 25). On October 3, 2014, SURS replied that "… you are confusing two articles of the statute" and explained the difference between 40 ILCS 5/15-139 and 40 ILCS 5/15-139.5. (*Id.*). Lizalde acknowledged that "[she] was definitely confusing the two statues mentioned…" (*Id.*). As a result, another annuitant, Ron Srenlawski, exceeded his earnings limitation the prior academic year but remained in the College's employ. (Lizalde Tr. 35).

---

[3] The Biss Act was amended to establish a universal academic year beginning September 1st.  (Ex. 11).

Because it employed three affected annuitants after September 1, the College was assessed a penalty of approximately $75,000. (Martens Ex. 39). Nearly $66,000 was attributable to a single individual for whom Lizalde had incorrectly calculated the earning limitation based on the older portion of the return to work law, and not the 40% limitation. (Lizalde Tr. 33-34; Martens Day 2 Tr. 65-66).

When Lizalde learned of the looming penalty to the College, she informed Martens. (Lizalde Tr. 42). Almost immediately, Martens determined that the College should no longer employer any annuitant regardless of whether they were "affected." (Martens Day 2 Tr. 70-71). Martens took the issue to the College's President, Margaret Lee, and the President's advisory council. (Lee Tr. 66). Defendants Smith, Anthony, Brooks, Evans, Hamel, Hands, Lucas, and Martens all served on the advisory council at that time. (Smith Tr. 24-25, Lee Tr. 19).

During their deliberations, both the President and the President's Advisory Council knew that numerous adjunct and part-time time faculty could *never* be impacted by the Return-to-Work law. (Hamel Tr. 79, 82-83). This was because the maximum hours for adjunct faculty was 27 lecture hours. (Martens Tr. 29). The maximum compensation for any adjuncts in 2015-2016 academic year was $1,490 per LHE. (Martens Tr. 32; Ex. 4 at p. 26). Thus, part-time or adjunct faculty could not earn more than $40,230 in that year. Nevertheless, the College decided it would not employ annuitants after July 2015, whether or not they could ever become "affected" under the law because she believed it would be "inequitable" to treat the some annuitants differently than others. (Martens Day 2 Tr. 94-96). On November 14, 2014, the College informed all annuitants of its decision via mass email. (Ex. 14).

The decision to not employ SURS annuitants after July 1, 2015 was not based on any annuitant-employee's job performance, class schedule, or availability to teach classes. (Am. Req.

for Admissions 6, 7; Hamel Tr. 68). The sole reason the College terminated the annuitants' employment was the fact that they were receiving a SURS annuity. (Martens Day 2 Tr. 90; Hamel Tr. 60). The decision applied college-wide; it was not made by individual deans. (Hamel Tr. 67). Approximately 79 individuals, both faculty and staff, were affected by the decision. (Ex. 38).

After the College announced its decision, seventeen adjunct faculty annuitants filed grievances through the OCCAFA. (Hamel Tr. 55). All seventeen grievances were forwarded to Thomas Hamel, the College's vice president of academic affairs and its designated point person. (Hamel Tr. 56). With the exception of a few personal details, Hamel's written response to all seventeen grievances was identical, as "[t]he goal was to provide consistent information regardless of the division or discipline or reporting structure." (Hamel Tr. 57, 61).

In January 2015, before the Policy became effective, the Biss Act was revised to exempt from the 40% earnings limitation those annuitants whose annuity was less than $10,000 a year. As a result, another group of annuitants who never could have become "affected" were needlessly impacted by the College's decision. (Hamel Tr. 80-81). This issue was specifically raised during the grievance process, including by Plaintiff Filipek. (Hamel Tr. 81). Of the three affected annuitants who became "affected" in 2013-14, two received annuities of less than $10,000. (*See* Ex. 25 at 1), thus became exempted. Only one annuitant, Srenlawski, whose earnings were never monitored against the Biss Law's actual earnings limitation, remained "affected."

After Lee decided that the College would no longer employ annuitants as faculty, Lee employed one annuitant on a short-term basis. (Lee Tr. 90-91). She testified that, in doing so, she took steps to ensure that he would not exceed the 40% earnings limitation via a monitoring

7

process that she set up, which took "about two minutes" and incurred no costs to the College. (Lee Tr. 145-146).

## ARGUMENT

### I.   THIS CASE MEETS THE STANDARD FOR COLLECTIVE AND CLASS CERTIFICATION.

ADEA class actions follow the procedures of §16(b) of the Fair Labor Standards Act, 29 U.S.C. §216(b), not Rule 23 of the Federal Rules of Civil Procedure. The difference between the two types of action is that members of the collective action class (of the "collective") must opt into the suit to be bound by any judgment or settlement, while in a class action governed by Rule 23(b)(3) (a class action seeking damages), they must opt out to not be bound. *Espenscheid v. DirectSat USA, LLC,* 705 F.3d 770, 771 (7th Cir. 2013). Despite the difference between a collective action and a class action, and the absence from the FLSA's collective-action section of the kind of detailed procedural provisions found in Rule 23, case law has largely merged the standards, though with some terminological differences. *Espenscheid* 705 F.3d at 772. Joining a collective action and a class action or actions in one suit is both common and permissible. *Ervin v. OS Restaurant Services,* Inc., 632 F.3d 971, 974 (7th Cir. 2011).

### II.   THE STANDARDS FOR CERTIFICATION OF A COLLECTIVE ACTION FOR DAYTON'S AGE-DISCRIMINATION CLAIMS ARE MET IN THIS CASE.

Dayton's claim that the College's decision to not employ SURS annuitants after July 1, 2015 had a "disparate impact" on older faculty contrary to the protections under the ADEA. Under the ADEA, a disparate impact theory is available "when an employer has adopted a particular employment practice that, although neutral on its face, disproportionally and negatively impacts members of a protected class." *Cerutti v. BASF Corp.,* 349 F.3d 1055, 1067 (7th Cir. 2003)(internal quotations omitted)(*quoting Bennett v. Roberts,* 295 F.3d 687, 698 (7th

8

Cir. 2002)); *Smith v. City of Jackson,* 544 US 228, 239 (2005) (discussing availability of disparate impact under ADEA). "In general terms, disparate impact cases are more amenable than other types of discrimination claims to class treatment, since they arise out of specific policies or practices that have a disproportionate impact on an entire class of employees." *Cooper v. Southern Co.,* 390 F.3d 695, 724 (11th Cir. 2004) (overruled on other grounds).

Dayton's claims meet all of the criteria for collective certification under §216(b). In making determinations on collective certification, the Court considers: "(1) whether the plaintiffs share similar or disparate factual and employment settings; (2) whether the various affirmative defenses available to the defendant would have to be individually applied to each plaintiff; and (3) fairness and procedural concerns." *Strait v. Belcan Eng'g Group,* 911 F. Supp. 2d 709, 718 (N.D. Ill. 2012).

In this case, the decision to terminate the employment of all annuitants and to bar them from future employment was made on a College-wide basis. Vice President of Academic Affairs Tom Hamel, then-President Margaret Lee, and Director of Human Resources Mum Martens each testified that the Policy impacted all departments within the College. A single email announced the Policy college-wide. (Ex. 14) Individual departments or disciplines could not make any exceptions to the policy; exceptions could only be granted by the College's president. (*Id.*)

All proposed class members were covered by the same terms and conditions of employment, specified in the OCCAFA CBA, including wages. (Hamel Tr. 120, Ex. 4). All proposed class members received identical information from the College about its decisions concerning annuitants via form letters and mass emails sent to all class members in July 2013, September 2013, October 2014, and November 2014. (Ex. 1, 2, 14, 29). Other memoranda concerning annuitants were also applied to all faculty on a college wide basis. (Ex. 13)

9

Grievances concerning the employability of annuitants were all handled identically. (Hamel Tr. 57-61, Ex. 18, 19).

The College's affirmative defenses apply to all class members equally. This is because the College's defense that its decision not to employ annuitants was solely made to avoid incurring penalties under the Biss Act. (Lee Tr. 61) This defense applies to all members of the collective class. Monitoring of annuitants under the Biss Act was done by the College's Human Resource department, on a college-wide basis. (See Ahrndt Tr. 47, Lizalde Tr. 14; Ex. 5, 6, 12). Thus, the applicability of the Biss Act and the College's attempts to monitor compliance under that Act are subject to class-wide proof.

No fairness or procedural concerns arise from certification of the class. Dayton's charge with the EEOC explicitly anticipated piggybacking the claims of putative class members claims with his own. (Docket 1, Complaint Ex. A (stating "I also believe that Oakton Community College has discriminated against me and others similarly situated because of my age (69) and the ages of those similarly situated (all over the age of 40) by adopting this policy.")); *See Anderson v. Montgomery Ward & Co.,* 852 F.2d 1008, 1016-1017 (7th Cir. 1988) (discussing piggybacking). At Defendant's insistence, the Court has already consolidated Named Plaintiff Barry Dayton's collective action with the separate cases of Daniel Filipek and Donald Krzyzak. (Docket No. 24). Counsel for Filipek and Krzyak has participated in all depositions to date. Additionally, eighteen (18) putative class members have already opted-in to the lawsuit by filing consents with the Court. (Docket No. 11, 15). The administrative charge and litigation to date have been conducted in a manner consistent with class treatment of the ADEA claims.

## III.    THE STANDARDS FOR CLASS CERTIFICATION UNDER RULE 23(A) ARE MET IN THIS CASE.

Dayton also moves to certify his second and third claims under Rule 23. The second claim alleges a violation of 42 U.S.C. § 1983. To the extent that 40 ILCS 5/15-139.5(b)(2) provides a basis for terminating the employment of SURS participants on the basis of age, contrary to the protections against discrimination on the basis of age contained in the ADEA and is preempted by federal law. (Docket No. 1, Compl. ¶¶50-53). The third claim alleges that the College terminated Dayton's employment and the employment of other members of the Rule 23 class in retaliation for their participation in SURS in violation of Article XIII, Section 5 of the Illinois Constitution. (*Id.* at ¶¶54-57). Such claims are appropriately certified under Rule 23.

A class may be certified if "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Once a potential class satisfies the Rule 23(a) prerequisites, the potential class must also satisfy at least one provision of Rule 23(b). *Arreola v. Godinez*, 546 F.3d 788, 797 (7th Cir. 2008).

## A. DAYTON'S CLAIMS MEET THE PROVISIONS OF RULE 23(A).

### 1. Issues of Law and Fact Apply to Plaintiffs Claims under 42 U.S.C. §1983 and the Illinois Constitution.

To meet the commonality requirement, Dayton must show that there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Even a single common question of law or fact will do. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011).

The same common set of facts that apply to Dayton's ADEA claims, also apply to the claims under §1983 and the Illinois constitution. The decision to terminate the employment of all

11

annuitants and to bar them from future employment was made on a College-wide basis. The College's affirmative defenses apply to all class members equally. All members of the proposed class were covered by identical terms and conditions of employment. Communications and decisions concerning SURS annuitants were subject to form letters and mass emails sent to all class members. In substance, the facts for all putative class members are common.

There are common questions of law on whether the College violated Article XIII, section 5 of the Illinois Constitution where it discharged class members based on their status as SURS annuitants. Under Illinois law, the tort of retaliatory discharge was first recognized as an exception to employment-at-will in *Kelsay v. Motorola, Inc.,* 74 Ill. 2d 172, 182, 384 N.E.2d 353, 357 (1978). The tort has subsequently been extended to situations involving whistleblower claims, *Palmateer v. International Harvester Co.,* 85 Ill. 2d 124, 133, 421 N.E.2d 876, 880 (1981), and termination of unionized employees, *see Midgett v. Sackett-Chicago, Inc.,* 105 Ill. 2d 143, 150, 473 N.E.2d 1280, 1284 (1984). Thus, a common legal issue exists whether the Plaintiff and members of the putative class were terminated in retaliation for their membership in "any pension or retirement system of the State." *See* Ill. Const., Art. XIII, § 5.

A common question of law also exists as to whether the Biss Act is preempted by the ADEA. Under the Supremacy Clause, a state statute which conflicts with a federal statute cannot stand. *EEOC v. County of Allegheny,* 705 F.2d 679, 682 (3d Cir. 1983). A political subdivision of a state is not shielded from liability for employment discrimination in violation of the ADEA merely because its actions were mandated by contrary state law. *Quinones v. City of Evanston,* 58 F.3d 275, 278 (7th Cir. 1995) (discussing liability under 42 U.S.C. § 1983). Thus, there is a common legal issue: whether the College can rely on the Biss Act as its basis for terminating the employment of part-time and adjunct annuity faculty.

12

2.      **The Class is Sufficiently Numerous to Warrant Class Certification.**

To satisfy numerosity, Plaintiffs must show that the class is so large as to make joinder impractical. Fed. R. Civ. P. 23(a)(1). A class of 40 or more is generally sufficient to establish numerosity, though Courts in this District have certified classes with as few as 18 members. *Elizarri v. Sheriff of Cook Co.*, No. 07-2427, 2011 U.S. Dist. LEXIS 7093, *3 (N.D. Ill. Jan. 24, 2011); *McCabe v. Crawford & Co.*, 210 F.R.D. 631, 643 (N.D. Ill. 2002). The proposed class here includes approximately 60 part-time and adjunct faculty. (Ex. 5, 6, 38). Numerously is met.

3.      **Plaintiff's Claims are Typical of Those of the Proposed Class.**

In practice, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." *Spano v. Boeing Co.,* 633 F.3d 574, 586 (7th Cir. 2011) (citation omitted). A claim is typical if it "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and... her claims are based on the same legal theory." *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir. 1992). Typicality is established where the named representative suffered the same injury as members of the proposed class. *Suchanek v. Sturm Foods, Inc.,* 764 F.3d 750, 758 (7th Cir. 2014).

Named Plaintiff Dayton was employed as adjunct faculty at OCC's Des Plaines Campus between 1994 and 2015. (Docket No. 20, Answer at ¶14) Since 2004, Dayton has been over the age of 40 and received a retirement annuity from SURS. (*Id.* at ¶15) Like all other adjunct faculty annuitants, Dayton's employment at the College terminated effective July 1, 2015, following the November 2014 decision to terminate all annuitants. (*Id.* at ¶31) His claims are typical of those of the other class members.

4.      **The representative parties will fairly and adequately protect the interests of the class.**

13

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "This adequate representation inquiry consists of two parts: (1) the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests, and (2) the adequacy of the proposed class counsel." *Gomez v. St. Vincent Health, Inc.,* 649 F.3d 583, 592 (7th Cir. 2011).

Both Dayton and his counsel are adequate representatives in this case. No differing or separate interests exist which would impair Plaintiff Dayton's role as class representative. Lead class counsel, Nathan Eisenberg, has served as lead counsel and associate counsel in similar class and collective actions. Most recently, this includes serving as class representative in *Juelaine Miller v. Thedacare,* Case No. 15-C-506 (E.D. Wis.) (2,400 person class and collective action wage claim), *Michael Merrill v. Briggs & Stratton,* Case No. 10-cv-700 (E.D. Wis.) (1,00 person class action ERISA claim), and *Roselyn Dexter v. Ministry Health Care,* 14-cv-087 (W.D. Wis.) (800 person class and collective action wage claim).

Adequacy of representatives is met under such circumstances.

**B.      RULE 23(B)(3) IS MET WHERE QUESTIONS OF LAW OR FACT COMMON TO CLASS MEMBERS PREDOMINATE OVER ANY QUESTIONS AFFECTING ONLY INDIVIDUAL MEMBERS.**

The predominance requirement of Rule 23(b)(3) tests whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997). When a proposed class challenges a uniform policy, as here, the validity of that policy tends to be the predominant issue in the litigation. *Streeter v. Sheriff of Cook County,* 256 F.R.D. 609, 614 (N.D. Ill. 2009); *Herkert v. MRC Receivables Corp.*, 254 F.R.D. 344, 352 (N.D. Ill. 2008).

14

The sole issues in this case are whether the College's decision to prohibit all annuitants from employment violated §1983 and the Illinois Constitution. That class members were employed in different departments and divisions, and reported to different deans and department chairs, is immaterial. The Policy was enacted on college-wide, not departmental or division-wide, basis by the College's then-president Lee, with Martens' advice. Although individual departments were asked to effectuate policies by Lee and Martens, the policy itself was determined and implemented college-wide. (Docket No. 20, Answer ¶31; Ex. 14).

The College claims it considered a variety of factors in *monitoring* the Biss Act earnings limitation, but these claims are immaterial. The College's decision to terminate the adjunct and part-time annuitants was not based on actual compliance with the Biss Act. Marten, Hamel, and Lee all acknowledged that the decision to terminate annuitants was not based on course load, work performance, or schedule. (Am. Req. for Admissions 7, 8). The Policy was based entirely on faculty members' status as annuitants, and Martens acknowledged that there are no individualized issues relating to the College's Policy because she believed that such issues would make the non-reemployment Policy inequitable. (Martens Day 2 Tr. 94-96).

Where the decision to terminate annuitants and prohibit them from future employment was made on college wide basis, class issues predominate over individual issues. In fact, any individualized issues are tangential to the legal issues and would not impact class certification.

## CONCLUSION

For the foregoing reasons, the Court should grant collective and class certification of the Plaintiff's claims. Plaintiff further requests that the Court require that the Defendants provide a list of last known addresses for adjunct and part-time faculty employed by the College during the 2013-2014 academic year and approve that notice to class members be sent to such individuals.

15

Dated this 27th day of February, 2016.

/s/ Nathan D. Eisenberg
Nathan D. Eisenberg (Ill. Bar No. 6307413)
nde@previant.com
Sara J. Geenen
sjg@previant.com
Erin F. Medeiros
efm@previant.com
THE PREVIANT LAW FIRM, S.C.
310 West Wisconsin Ave. Suite 100 MW
Milwaukee, WI  53203
Telephone: 414/271 4500
Fax: 414/271 6308

(LEAD COUNSEL)

Stephen Yockich (Ill. Bar No. 6181707)
syockich@laboradvocates.com
Dowd, Bloch, Bennett, Cervone, Auerbach &
Yokich
8 South Michigan Avenue – 19th Floor
Chicago, IL  60603
Telephone:  312/ 372-1361
Fax:  312/372-6599

(LOCAL COUNSEL)

Attorneys for Plaintiffs

16

<u>CERTIFICATE OF SERVICE</u>

I, Nathan D. Eisenberg, an attorney, certify that a copy of Plaintiffs' Brief in Support of

Collective and Class Certification was served on the attorney(s) listed herein, via e-mail on

February 27, 2017.

Frank B. Garrett III
Philip H. Gerner III
Jennifer L. Jones
Robbins Schwartz
55 West Monroe Street, Suite 800
Chicago, Illinois 60603

Stephen Yockich
syokich@laboradvocates.com
Dowd, Bloch, Bennett, Cervone, Auerbach & Yokich
8 South Michigan Avenue – 19th Floor
Chicago, IL 60603

George S. Frederick, Esq.
David Weiss, Esq.
george@mkfmlaw.com
david@mkfmlaw.com
Mirabella, Kincaid, Frederick & Mirabella 1737
S. Naperville Raod, Suite 100
Wheaton, IL 60189

/s/ Nathan D. Eisenberg