IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DANIEL M. FILIPEK, | |
| Plaintiff, | |
| v. | No. 1:16-cv-02902 |
| OAKTON COMMUNITY COLLEGE, | Honorable Matthew Kennelly |
| Defendant. | Consolidated with |
| DONALD A. KRZYZAK, | |
| Plaintiff, | |
| v. | No. 1:16-cv-03215 |
| OAKTON COMMUNITY COLLEGE, | |
| Defendant. | Consolidated with |
| BARRY H. DAYTON, Individually and on behalf of all others similarly situated, | |
| Plaintiff, | |
| v. | No. 1:16-cv-06812 |
| OAKTON COMMUNITY COLLEGE, MARGARET B. LEE, JOIANNE SMITH, MICHAEL ANTHONY, KARL BROOKS, MAYA EVANS, TOM HAMEL, COLETTE HANDS, BONNIE LUCAS and MUM MARTENS, | |
| Defendant. | |

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 2

FACTS ................................................................................................................... 3

    A.    Adjunct and Part-Time Faculty members have no expectation
         of continued employment with the College. ......................................... 3

    B.    The terms and conditions of re-employment of each Adjunct
         and Part-Time Faculty member are unique to each individual. ..................... 4

    C.    The SURS Return to Work Law impeded the College's ability to
         continue to employ SURS annuitants, which included some
         Adjunct and Part-Time Faculty members........................................... 5

         40 ILCS 5/15-106 ........................................................................ 5

         40 ILCS 5/15 ..................................................................... 5, 6

         40 ILCS 5/15-107 ........................................................................ 6

         40 ILCS 5/15-139.5 ..................................................................... 6

    D.    The College's system of monitoring SURS annuitants' employment
         involved multiple factors and relied upon the cooperation of many
         College employees ....................................................................... 7

    E.    Each SURS annuitant presents unique circumstances with respect
         to his or her annuity ...................................................................... 8

    F.    The College erroneously employed several affected annuitants,
         and as a result, decided to no longer employ any SURS annuitant .............. 9

ARGUMENT .......................................................................................................... 11

I.    Dayton fails to meet the standard for collective action certification
    under § 216(b)................................................................................... 11

    *Strait v. Belcan Eng'g Group*, 911 F. Supp. 2d 709, 718 (N.D. Ill. 2012) ........... 11, 12, 14

    *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 100 (2008) ................................. 12

II.    Dayton fails to meet the standard for class certification under FRCP 23................ 14

    *Califano v. Yamasaki*, 442 U.S. 682, 700–701 (1979) ...................................... 14

    *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ............................... 14

    *Arreola v. Godinez*, 546 F.3d 788, 797 (7th Cir. 2008) ................................... 14

**A.**     **Dayton fails to meet the standard for class certification under FRCP 23(a)** .......................................................................... **15**

     *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006) ............................ 15

     *Simer v. Rios*, 661 F.2d 655, 669 (7th Cir. 1981) ................................................ 15

     **1.**     **Dayton's putative class is fatally indefinite** ........................................ **15**

        *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 494-95 (7th Cir. 2012) ........................................................................... 15

     **2.**     **Dayton fails to establish sufficient commonality between his claim and the claims of the putative class members** .................. **16**

        *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ...................... 16

        *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982) ...................... 16

     **3.**     **Dayton fails to establish that his claims are typical of those common to the class** ................................................................. **18**

        *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) ...................... 18

        *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 597 (7th Cir. 1993) ........................................................................... 18

        *De La Fuente v. Stokely–Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) ........................................................................... 18

        *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 824 (7th Cir. 2011) .......... 19

     **4.**     **Dayton cannot fairly or adequately protect the interests of the putative class members** ................................................... **19**

        *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 824 (7th Cir. 2011) ..... 19, 20

        *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 624 (1997) .................... 20

**B.**     **Dayton cannot establish the predominance requirement of FRCP 23(b)(3)** .................................................................................... **20**

     *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) ........................... 20, 21

     *Arreola v. Godinez*, 546 F.3d 788, 797 (7th Cir. 2008) ...................................... 21

**CONCLUSION** ........................................................................................................ **21**

ii

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DANIEL M. FILIPEK, | |
| Plaintiff, | |
| v. | No. 1:16-cv-02902 |
| OAKTON COMMUNITY COLLEGE, | Honorable Matthew Kennelly |
| Defendant. | Consolidated with |

| | |
|---|---|
| DONALD A. KRZYZAK, | |
| Plaintiff, | |
| v. | No. 1:16-cv-03215 |
| OAKTON COMMUNITY COLLEGE, | |
| Defendant. | Consolidated with |

| | |
|---|---|
| BARRY H. DAYTON, Individually and on behalf of all others similarly situated, | |
| Plaintiff, | |
| v. | No. 1:16-cv-06812 |
| OAKTON COMMUNITY COLLEGE, MARGARET B. LEE, JOIANNE SMITH, MICHAEL ANTHONY, KARL BROOKS, MAYA EVANS, TOM HAMEL, COLETTE HANDS, BONNIE LUCAS and MUM MARTENS, | |
| Defendant. | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO
PLAINTIFF DAYTON'S MOTION
<u>FOR COLLECTIVE AND CLASS CERTIFICATION</u>**

Defendants, OAKTON COMMUNITY COLLEGE, MARGARET B. LEE, JOIANNE SMITH,

MICHAEL ANTHONY, KARL BROOKS, MAYA EVANS, TOM HAMEL, COLETTE HANDS,

BONNIE LUCAS and MUM MARTENS (collectively, "the Defendants") by their counsel, Frank B.

Garrett III, Philip H. Gerner III, and Jennifer L. Jones of Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd., hereby Respond in Opposition to Plaintiff Dayton's Motion for Collective and Class Certification as follows:

## INTRODUCTION

Dayton's Motion for Class and Collective Action Certification should be denied in its entirety. Dayton's proposal to certify a class and collective action on behalf of "all part time faculty who were denied employment at Oakton Community College as the result of its policy to not employ or re-employ State Universities Retirement System annuitants and who are not 'affected annuitants' pursuant to 40 ILCS 5/15-139.5(b)(2)" is premised upon the fallacy that all part time faculty SURS annuitants who were not re-employed by the College after July 1, 2015 were similarly situated in their employment and entitled to re-employment, and therefore, sustained damages as a result.

Dayton believes that he sustained damages as a result of the College's decision to no longer employ State Universities Retirement System ("SURS") annuitants after July 1, 2015. His claims are premised upon his contention that, but for the College's decision, his own employment with the College would continue. Dayton, as an adjunct faculty member, was employed on a term-by-term basis, and in fact, has no right to continued employment with the College. Therefore, Dayton's claim for damages resulting from the College's decision depends upon a multitude of factors related to the assignment of courses to adjunct faculty, as well as a showing that he would not have become an affected annuitant if his employment continued.

Contrary to Dayton's assertion, whether each putative class member is able to state a claim for damages as a result of the College's decision will depend upon an individualized assessment of multiple factors to establish that, but for the College's decision, he or she would hold employment with the College. Additionally, each putative class member will need to show that, if his or her employment with the College continued, he or she would not have become an affected annuitant, since class membership excludes "affected" annuitants.

2

The Court will therefore be required to consider: each part-time or adjunct faculty member's classification during the appropriate academic term, which of the approximately 80-90 Deans, Chairs and Coordinators he or she reported to, priority rights of assignment, work patterns, backgrounds, areas of expertise, courses previously taught, and course offerings in the appropriate academic term, among other factors.

Ultimately, Dayton cannot establish that he is similarly situated to, or that he can adequately represent his putative class members. His motion thus fails under both § 216(b) and FRCP 23. This Court should deny and dismiss Dayton's Motion for Class and Collective Action Certification in its entirety.

## **FACTS**

### A.    **Adjunct and Part-Time Faculty members have no expectation of continued employment with the College.**

The College is a two-year institution, organized pursuant to the provisions of the Illinois Public Community College Act, 110 ILCS 805/1 *et. seq.* The College is divided into four academic divisions including: Science and Health; Humanities and Languages; Social Sciences and Business; and Mathematics and Technologies. (Hamel Tr. 12.) These divisions, led by the "Deans," are divided into departments, which are led by "Chairs" and their "Coordinators." (Hamel Tr. 8, 21; Martens Day 2 Tr. 12.)  There are approximately 80-90 different individuals with the title of "Dean," "Chair" or "Coordinator." (Martens Day 2 Tr. 112.)

The College also employs full-time faculty members, who are primarily responsible for the College's curriculum and instruction. (Martens Day 2 Tr. 12; Lee Tr. 99.) Faculty are hired by the College's Board of Trustees (the "Board") as full-time employees, and are subject to the provisions of the collective bargaining agreement ("CBA") between the College and the Faculty Association (the "FA"). (Martens Day 1 Tr. 12, 20.) Full-time faculty members report to the Deans. (Hamel Tr. 21.)

3

In addition to full-time faculty, the College employs several categories of part-time faculty to assist with course instructional duties. (Martens Day 1 Tr. 50-51; Hamel Tr. 21.) The term "Part-time" faculty refers to all employees who teach courses on a part-time basis, within all divisions of the College. (Hamel Tr. 120.) "Adjunct" faculty are part-time faculty who are represented by the Adjunct Faculty Association (the "AFA") and are covered by the 2013-2017 CBA, if they qualify for membership under the recognition clause. (Hamel Tr. 120; Dep. Ex. 4, Article I, Section 1.1.)

These "adjunct faculty" course instructors teach at least six credit hours in the current semester, or alternatively, no fewer than three credit hours in the current semester, and have taught at least six credit hours in either of the two previous semesters, not including the summer. (Dep. Ex. 4, Article I, Section 1.1.A.) Neither "part-time" nor "adjunct" faculty members are eligible for tenure, and neither have rights to continued employment with the College. (*See. Id.*; Lee Tr. 154-155.) The CBA also does not contain any provision to grant any adjunct faculty member the right to continued bargaining unit eligibility. (*Id.*)

## B. The terms and conditions of re-employment of each Adjunct and Part-Time Faculty member are unique to each individual.

"Part-time" and "adjunct" faculty are best characterized as a "labor pool in flux." (Lee Tr. 154-155.) Section 2.6.C of the CBA specifically provides that the offer of a course assignment shall be within the sole discretion of the College. (Dep. Ex. 4.) Course assignments to adjunct faculty bargaining unit members are made by the Dean of each division, through department Chairs and Coordinators, on a term-by-term basis. (Lee Tr. 24; Hamel Tr. 95; Dep. Ex. 4, Section 2.6.A.1.) Unlike the hiring of faculty members, course assignment offers to part-time and adjunct faculty are not approved by the Board. (Martens Day 1 Tr. 20; Hamel Tr. 95.)

Under Section 2.6.C.1, there is no guarantee that any adjunct faculty bargaining unit member will receive a course assignment or reassignment in a given academic term. (*Id.*; Lee Tr. 154, 157-58.) In order to receive a course assignment, each part-time or adjunct faculty member must submit a course request form each academic term. (Dep. Ex. 4, "Adjunct Scheduling

Preference Form", attached to CBA.) The Adjunct Scheduling Preference Form specifically states, "[p]lease be aware that your submission of this document is merely a request for an assignment, not a guarantee of one." (*Id.*) Course assignments are made based upon many factors including the courses offered in an academic term, the qualifications of potential adjunct and part-time faculty to teach a course, priority assignment rights and department needs, among other factors. (*Id.*; *See e.g.* Martens Day 2 Tr. 89). Dayton's purported class members have taught various different courses within different departments and divisions of the College. (*See e.g.* Dep. Ex. 38.)

The priority of assignments is governed by Section 2.6.C.1. For example, "22 or More Semester Adjuncts" receive first priority, then "Affiliated Adjuncts," followed by "Adjuncts." (Dep. Ex. 4.) Additionally, "Adjunct faculty members who develop a course" are also given priority for assignment to their course. (*Id.*) Once a part-time or adjunct faculty member receives a course assignment, there are various ways for that individual to receive additional compensation. (Lee Tr. 37-38; Martens Day 2 Tr. 8, 12-18.) For example, certain part-time or adjunct faculty may receive compensation for tutoring assignments, attending meetings, and other related activities. (*Id.*) As a result, the compensation of each part-time or adjunct faculty member varies. (*See Id.*)

**C.    The SURS Return to Work Law impeded the College's ability to continue to employ SURS annuitants, which included some Adjunct and Part-Time Faculty members.**

As an Illinois public community college, the College is a participating employer for purposes of the State Universities Retirement System ("SURS"). (*See* 40 ILCS 5/15-106.) SURS is an agency of the State of Illinois established pursuant to the Illinois Pension Code that administers retirement, disability, death, and survivor benefits to eligible SURS participants and annuitants in accordance with the Illinois Pension Code. (*See* 40 ILCS 5/15 *et. seq.*). Generally, if an individual is employed by a participating public employer and his or her position requires the individual to work continuously for at least one academic term or four months, whichever is less, the employee must participate in SURS. (40 ILCS 5/15-107.) Participants covered by SURS make financial contributions to SURS until retirement. (*See* 40 ILCS 5/15 *et. seq.*) Upon retirement, a

participant becomes an annuitant and begins to collect an annuity from SURS. (*Id.*) In the past, the College employed SURS annuitants as part-time and adjunct faculty. (Smith Tr. 65-66.)

In August 2012, however, an additional return to work restriction for SURS annuitants was signed into law, which created a new subsection of the Illinois Pension Code. (*See* 40 ILCS 15/15-139.5). This law created a new funding mechanism targeted at SURS-covered employers that employ SURS annuitants based on certain criteria. (Martens Day 1 Tr. 43-46.) Under the law, the College incurs a financial penalty payable to SURS if it employs an "affected" annuitant on or after August 1, 2013. (40 ILCS 15/15-139.5.) An employed annuitant becomes affected on the first day of an academic year following the academic year in which the annuitant initially meets both of the following conditions: (1) the annuitant receives compensation during an academic year beginning after August 1, 2013, that is greater than 40% of the highest annual rate of earnings earned prior to retirement; and (2) the annuitant receives an annualized retirement annuity of at least $10,000.00. (*Id.*)

The financial penalty incurred by the College is equal to the affected annuitant's annualized annuity payable on the day on which the employer employs the annuitant who has become affected. (*Id.*) The financial penalty must be paid by the College for each academic year it employs an affected annuitant. (*Id.*) A person who becomes an affected annuitant remains an affected annuitant, except for any period during which the person returns to active service and does not receive a retirement annuity from the System. (*See Id.*) Under the new SURS law, the burden is shifted to the College, from the annuitants, to monitor and pay penalties for employment of affected annuitants. (Martens Day 1 Tr. 44-46; Ahrndt Tr. 24.)

When the SURS Return to Work law initially went into effect, the College determined that it would continue to employ SURS annuitants, but closely monitor their individual employment to ensure that the College did not employ any SURS annuitant who became affected. (Martens Day 2 Tr. 17-19, 73.) Both the provisions of the Return to Work law, and statements made by SURS representatives indicated that the College was solely responsible for tracking the employment of

SURS annuitants and paying the penalties associated with employment of affected annuitants. (Lizalde Tr. 37, 80-81.)

**D.     The College's system of monitoring SURS annuitants' employment involved multiple factors and relied upon the cooperation of many College employees.**

In Spring 2013, the College's Human Resources department initiated the process of monitoring the employment of SURS annuitants. (Lizalde Tr. 16.) First, employees of the Human Resources department identified all individuals employed by the College who were also SURS annuitants, and noted this information in the College's "Banner" online payroll system. (*Id.*) At that time, the College identified approximately 80 currently employed individuals as being SURS annuitants. (*See* Dep. Ex. 12; Dep. Ex. 38.) The SURS annuitants employed by the College at the time included not only some part-time and adjunct faculty members, but also other types of employees, such as "Professional Tutors," a "Call Center Agent" and a "Bookstore Assistant."[1] (*Id.*)

Next, the Human Resources department calculated each individual SURS annuitant's "40% earnings limitation". (Lizalde Tr. 17-18.) This figure was based upon the highest earnings limitation included in each SURS annuitant's "certificate of retirement annuity." (Lizalde Tr. 19.) These figures were vastly different for each employee, due to the variance of each individual's career earnings, length of service, and date of retirement. (Lee Tr. 37-40, 156.) Furthermore, some individuals' annuities were based on their monthly earnings, while other individuals' annuities were based on their annual earnings. (Lizalde Tr. 89.)

In July and September 2013, the College sent personalized letters to all individuals identified as SURS annuitants. (Dep. Ex. 1; Dep. Ex. 2; Lizalde Tr. 79-80.) The College explained the requirements of the new SURS Return to Work Law and the new restriction that the College

---

[1] When the Return to Work law initially took effect, SURS offered colleges the option of logging into the SURS system in order to access a list of annuitants currently employed at their institution. This was a "one-time" offer, however, and after receiving this initial list from SURS, it became each college became responsible for identifying, on an on-going basis, which employees were SURS annuitants. (Martens Day 2 Tr. 105-6.)

would not re-employ SURS annuitant who became "affected." (*Id.*) Additionally, each SURS annuitant was informed of the College's calculation of his or her "40% earnings limitation" and requested that each annuitant produce a copy of his or her certificate of retirement annuity so that the College could confirm each SURS annuitant's status. (*Id.*) Although the College was responsible for collecting and monitoring the employment of SURS annuitants in order to avoid incurring penalties, it necessarily relied upon the individual SURS annuitants to accurately report their status and rate of earnings prior to retirement. (*See. e.g.* Lizalde Tr. 10.)

Once the Human Resources department identified all SURS annuitants who were currently employed, and calculated each annuitant's "40% earnings limitation", this information was entered into spreadsheets, which were then used by Human Resources employees to monitor the employment of SURS annuitants. (Lizalde Tr. 81-83.) As course assignments are made by each department of the College, on a term-by-term basis, it was the duty of the approximately 80-90 Deans, Chairs and Coordinators to communicate with Human Resources regarding their offers of course assignments to part-time and adjunct faculty on a term-by-term basis, so that Human Resources could confirm that no individual received a course assignment which would cause him or her to exceed his or her unique 40% earnings limitation. (*See* Lizalde Tr. 45-46; Martens Day 2 Tr. 111-12.)

**E.    Each SURS annuitant presents unique circumstances with respect to his or her annuity.**

Monitoring the employment and earnings of approximately 80-plus SURS annuitants proved difficult, based upon the unique circumstances of each individual's employment with the College. (Lee Tr. 93-95; Martens Day 2 Tr. 93-95.) For instance, Human Resources relied upon the Deans, Chairs, Coordinators, and the SURS annuitants, to accurately report information. (Martens Day 2 Tr. 20-21, 93-95.) Because each department and division of the College is responsible for tracking its own payroll, a SURS annuitant could receive a course assignment from two different departments of the College, which could cause him or her to become affected

without advance notice to the Human Resources department. (Martens Day 2 Tr. 26, 93-95, 103; Lizalde Tr. 45.) Furthermore, each part-time or adjunct faculty member has a different rate of pay. (*See* Dep. Ex. 4, Article VIII.)

Additionally, a part-time or adjunct faculty member could receive tutoring assignments from the learning center. (Lizalde Tr. 49-52, 72.) Tutoring hours are compensated on an hourly basis as opposed to lecture hour equivalents ("LHE"s), which further complicates the tracking of payments being made to SURS annuitants. (*Id.*) The Human Resources department does not see an individual's earnings until each paycheck is issued, and requests for additional compensation are often submitted well after the work has been performed. (Martens Day 2 Tr. 26.) Another risk associated with monitoring the employment of SURS annuitants included the annual Cost of Living Adjustment (COLA) increases to each annuity. (Martens Day 2 Tr. 95.) Based on COLA increases, even if an SURS annuitant initially appeared to be an "exempt" annuitant, due to earning an annual annuity of less than $10,000.00, a COLA increase could cause a previously exempt SURS annuitant to become affected without the College's knowledge. (*Id.*)

These individualized factors, coupled with necessary reliance on many different individuals to accurately and timely report information, made monitoring the individual employment of SURS annuitants difficult. (Lee Tr. 94; Lizalde Tr. 68, 84.) To further complicate matters, Human Resources received confusing and conflicting information from SURS representatives related to how each individual SURS annuitant's earnings limitation should be calculated. (Lee Tr. 109, 110.) SURS provided very little assistance to track and monitor these employees' earnings and limitations. (*Id.*)

**F.    The College erroneously employed several affected annuitants, and as a result, decided to no longer employ any SURS annuitant.**

In the 2013-2014 academic year, the College attempted to monitor the employment of SURS annuitants to avoid employment of affected annuitants and the incurrence of unintended penalties. (Martens Day 2 Tr. 73.) The monitoring process proved burdensome and monopolized

a great deal of Human Resources employees' time. (Lizalde Tr. 92.) Additionally, despite its efforts, the College failed to identify all affected annuitants that it employed in Fall 2014, and inadvertently employed several affected SURS annuitants. (Martens Day 2 Tr. 53-55; 64-65.) This error occurred for several reasons, including: the failure of one adjunct faculty member to report his status as an annuitant, the College's erroneous calculation of earnings limitations, and miscommunication between the Deans, Chairs, Coordinators, and Human Resources, regarding course assignments to annuitants. (Lizalde Tr. 40-46.) As a result of the inadvertent employment of affected SURS annuitants, the College was exposed to approximately $75,000.00 in penalties, which it paid to SURS. (*See* Dep. Ex. 39.)

After incurring these penalties, the College's (then) President, Peg Lee, met with her President's Council (the "Council"). (Martens Day 2 Tr. 70.) At the time, the Council consisted of the following individuals: the Vice Presidents for Academic Affairs, Student Affairs, Information Technology, Business, the Assistant Vice Presidents, and the Chief Human Resources Officer. (Lee Tr. 19.) The Council discussed that the College must reconsider whether it should continue to employ SURS annuitants. (Martens Day 2 Tr. 70-74.) The Council discussed that it would be fiscally irresponsible to continue to expose its taxpayers to the risk of substantial monetary penalties associated with the risk of error which could result from continued monitoring. (Lee Tr. 100.) A simple monitoring error by the College could, and, in fact, did cost the College thousands of dollars in penalties to SURS. (*See* Dep. Ex. 39.)

Based on all of these considerations, the President's Council reached a consensus and determined that it was too great of a burden to reemploy any SURS annuitant, regardless of whether their status was "affected" or "non-affected". (Martens Day 2 Tr. 74-75; Lee Tr. 23, 60, 72; Smith Tr. 23, 28.) As a result of the consensus, President Lee made an administrative decision that the College would no longer employ any SURS annuitants effective July 1, 2015. (Lee Tr. 42.) This decision impacted all SURS annuitants employed by the College, not only part-time and adjunct faculty members. (*See e.g.* Dep. Ex. 14.) President Lee further decided to retain the

10

authority as President to make an exception and hire an SURS annuitant where necessary to meet a specific need of the College. (*Id.*; Smith Tr. 56.)

On November 13, 2014, Mum Martens, the College's Executive Director of Human Resources, e-mailed a notice to all SURS annuitants, not only part-time and adjunct faculty annuitants, to announce the College's decision to no longer employ SURS annuitants effective July 1, 2015. (*See* Dep. Ex. 14.)

## ARGUMENT

Dayton's motion for class and collective action certification should be denied in its entirety. Dayton proposes a class and collective action on behalf of "all part time faculty who were denied employment at Oakton Community College as the result of its policy to not employ or re-employ State Universities Retirement System annuitants and who are not 'affected annuitants' pursuant to 40 ILCS 5/15-139.5(b)(2)." (Complaint, ¶ 16.)

Dayton's motion fails under both § 216(b) and FRCP 23. The motion fails under § 216(b) because Dayton cannot establish that the putative class members are similarly situated. Furthermore, the motion fails under FRCP 23 because: (1) the class is fatally indefinite; and Dayton cannot establish: (2) commonality, (3) typicality; (4) that his personal claims are adequate to protect the interests of the class; or (5) that class issues predominate over individual claims. As a result, the Court should deny and dismiss Dayton's motion for class and collective action certification.

## I.      Dayton fails to meet the standard for collective action certification under § 216(b).

ADEA class actions follow the procedures of § 216(b) of the Fair Labor Standards Act, 29 U.S.C. § 216(b). When deciding whether to certify a collective action class under § 216(b), the Court considers: (1) whether the plaintiffs share similar or disparate factual and employment settings; (2) whether the various affirmative defenses available to the defendant would have to be individually applied to each plaintiff; and (3) fairness and procedural concerns." *Strait v. Belcan Eng'g Group*, 911 F. Supp. 2d 709, 718 (N.D. Ill. 2012). This Court has simplified these

considerations into the question of "whether the plaintiffs are similarly situated – whether a common question exists that can be answered without individualized inquiries." *Id.* at 720.

In *Strait*, this Court denied the plaintiffs' motion for collective action certification on the basis that the putative class members were situated "differently enough" so that the Court was required to undertake individualized assessments in order to determine the common issue of the case (i.e., whether the employer paid all putative class members a "salary" as defined by the FLSA). *Id.* at 721. The Court held that a collective action is not appropriate when the Court's determination of whether a plaintiff has a viable claim requires a detailed, fact-specific inquiry. *Id.* at 723. In *Strait*, the Court found that an individualized assessment would predominate over issues common to the collective class, where consideration of whether each plaintiff had a viable claim required detailed analysis of each employees' work environment, location, billing practices, use of vacation time, and managers. *Id.*

Similarly, here, the Court must conduct a detailed analysis of individualized factors in order to determine which class members have a claim against the College under ADEA, as a result of its decision to no longer employ SURS annuitants. This assessment will predominate over the issues common to the collective class. To further explain, Plaintiff's motion for collective action certification under § 216(b) is based upon his disparate impact claim under the ADEA. (Complaint, ¶ 2.) In order to state a *prima facie* case under the ADEA, a plaintiff must isolate the specific employment practices that are allegedly responsible for any observed statistical disparities, in order to "avoid the result [of] employers being potentially liable for 'the myriad of innocent causes that may lead to statistical imbalances'". *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 100 (2008).

The putative class members alleging violation of the ADEA based upon this disparate impact theory include "all part time faculty who were denied employment at Oakton Community College as the result of its policy to not employ or re-employ [SURS] annuitants [...]." (Complaint, ¶ 16.) Thus, to establish both membership in the class and entitlement to damages based on

12

violation of the ADEA, each individual plaintiff must demonstrate that the College's decision to no longer employ SURS annuitants is the reason that he or she is not currently employed by the College. This showing is impossible for the plaintiffs to make on a class-wide basis, because each part-time or adjunct faculty member is subject to different terms and conditions of employment and re-employment.

Part-time and adjunct faculty constitute a labor pool "in flux." (Lee Tr. 154-155.) Neither "part-time" nor "adjunct" faculty members have rights to continued employment with the College. (Dep. Ex. 4, Article I, Section 1.1.A.) Course assignments to part-time and adjunct faculty bargaining unit members are made by the Dean of each division, through department Chairs and Coordinators, on a term-by-term basis. (*See Id.*) Course assignments are made in priority order based upon each individual part-time or adjunct faculty member's classification (i.e. "part-time", "adjunct," "affiliated," etc.). (*Id.*; Lee Tr. 154-155.) Even if the College continued to employ SURS annuitants, it is not clear that any of the putative class members would currently be employed, and in fact, certain class members would have competing interests in continued employment with the College, based upon preferential assignment of courses.

Similarly, the College's ability to continue to employ the members of the putative class is varied, due to different degrees of risk associated with continued employment of each individual. For example, Dayton asserts that his own annuity is so high that it would be impossible for him to become an affected annuitant, based upon the course assignment limitations in the CBA. (*See* Dayton's Brief in Support, p. 6.) He similarly suggests that "another group" of some putative class members could never become an affected annuitant because their annuities fall within the $10,000.00 statutory exemption. (*See* Dayton's Brief in Support, p. 7.) By referring to some members of the putative class as "another group," Dayton acknowledges the disparate factors that apply to their purported claims. Furthermore, consistent with Dayton's assertion that there are in fact, varying "groups" of annuitants, some putative class members have annuities and earnings that in fact, are significantly more likely to expose the College to the risk of penalties. As

a result, the putative class members have competing interests in establishing individual claims for damages.

As in *Strait*, in order to make a determination regarding which putative class members are able to state a claim for damages, the Court must conduct a detailed assessment of individualized factors including the qualifications of each part-time or adjunct faculty, each individual's past courses taught, the current course offerings, each individual's priority rights of assignment, the size of his annuity, and his 40% earnings limitation, among others. The putative class members are situated "differently enough" to require such a detailed, individualized assessment to establish both membership in the class, and entitlement to damages. As a result, this Court should deny Dayton's motion for collective class certification under § 216(b).

## II.    Dayton fails to meet the standard for class certification under FRCP 23.

The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700–701 (1979). To come within the exception, a party seeking to maintain a class action "must affirmatively demonstrate his compliance" with Rule 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). In order to certify a class, the Court must be satisfied that the plaintiffs have met the requirements of both FRCP 23(a) and at least one subsection of FRCP 23(b). *Arreola v. Godinez*, 546 F.3d 788, 797 (7th Cir. 2008).

Class certification is appropriate only if, "after a rigorous analysis," the trial court is satisfied that the requirements of Rule 23 have been met. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. at 351. "Frequently, that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Id.* Dayton's motion for class action certification fails because he cannot establish the necessary elements for class certification under either FRCP 23(a) or 23(b). As a result, this Court should deny Dayton's motion.

**A.      Dayton fails to meet the standard for class certification under FRCP 23(a).**

FRCP 23(a) establishes four requirements for class certification: (1) numerosity; (2) commonality; (3) typicality; and (4) adequate representation. *Id.* at 349. These requirements "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Id.* Additionally, the plaintiff must also show that the class is indeed identifiable as a class. *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006); *citing Simer v. Rios*, 661 F.2d 655, 669 (7th Cir. 1981). Dayton's motion for class certification fails because: (1) his putative class is fatally indefinite; (2) the class members' claims lack factual commonality; (3) Dayton's claim is atypical of those of the class; and (4) as a result of these factors, he cannot fairly or adequately protect the interests of the members of the putative class.

**1.   Dayton's putative class is fatally indefinite.**

In determining whether to certify a putative class, the Court will first consider whether a putative class is sufficiently definite. *See Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 494-95 (7th Cir. 2012). A putative class is "fatally indefinite" where it is not possible for the Court to determine whether a presently unidentified individual is "potentially eligible" for services, which, if denied, form the basis for a common claim. *See e.g. Id.*

In *Jamie S.*, the Seventh Circuit held that a putative class was fatally indefinite where there was no way for the Court determine whether, in 2000-2005, a presently unidentified child was potentially eligible for special education services, which he or she did not receive, in violation of the IDEA. *Id.* The "fatally indefinite" class was defined as, "[t]hose students eligible for special education services from the Milwaukee Public School System who are, have been or will be either denied or delayed entry or participation in the processes which result in a properly constituted meeting between the IEP team and the parents or guardians of the student." *Id.* at 495.

Similar to *Jamie S.*, Dayton's putative class, defined as "all part time faculty who were denied employment at Oakton Community College as the result of its policy to not employ or re-employ [SURS] annuitants […]," is fatally indefinite because there is no way for the Court to

determine which, if any of the putative class members are or were potentially eligible to teach courses, which he or she did not receive solely as a result of the College's decision to no longer employ SURS annuitants. As a result, there is no way for the Court to determine which putative class members are able to state a claim for damages based on the alleged illegal decision. To further explain, it is impossible for the Court to determine which, if any of the putative class members would continue to be employed by the College, absent its decision to no longer employ SURS annuitants, without engaging in a detailed, individualized assessment to establish both membership in the class, and entitlement to damages. (*See* Argument, Section I.) Such a detailed, individualized assessment makes the putative class inherently and fatally indefinite.

### 2. Dayton fails to establish sufficient commonality between his claim and the claims of the putative class members.

In considering whether commonality exists, the Supreme Court has held that superficial common questions, such as whether each class member "suffered a violation of the same provision of law" – are not enough. *See Id.* at 497, *citing Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. at 351. Rather, "[c]ommonality requires the plaintiffs to demonstrate that the class members 'have suffered the same injury.' " *Id.*, *quoting Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982). The class "claims must depend upon a common contention," and "[t]hat common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

In *Jamie S.*, the Seventh Circuit found that the commonality requirement of FRCP 23(a) was not satisfied where the common issue was "[a]ll potential class members have suffered as a result of MPS' failure to ensure their Child Find rights under IDEA and Wisconsin law", because the plaintiffs failed to show that they shared some question of law or fact that could be answered "all at once", and that the "single answer" to that question would resolve a central issue in all class members' claims. *Id.*

16

Similarly, here, the putative class members cannot establish a question of law that may be answered all at once. Dayton asserts that class certification is appropriate because all putative class members' claims share the same questions of law, simply because all putative class members allege violation of the same laws. (*See* Dayton's Brief in Support, p. 6.) Dayton's assertion fails to meet the standard for class certification, however, because it is not clear which, if any, class members can establish a viable claim to damages under those laws, as a result of the College's decision to no longer employ SURS annuitants. A finding that the College violated 42 U.S.C. § 1983 or Art. XIII, § 5 of the Illinois Constitution still would not allow the Court to resolve, "all at once," the central question of whether the College violated these laws with respect to each putative class member.

In order to determine which, if any, of the putative class members are able to state a claim for damages under 42 U.S.C. § 1983 or Art. XIII, § 5 of the Illinois Constitution, based on the College's decision to no longer employ SURS annuitants, it is first necessary for the Court to establish which, if any, of the putative class members from this "labor pool in flux" would continue to receive course assignments, but for the College's decision. The Court would necessarily consider each putative class member's classification (i.e. "part-time", "adjunct", "affiliated", etc.) during the appropriate academic term (which is not clear at this phase of litigation), which of the Deans, Chairs and Coordinators each putative class member has reported to, any priority rights of assignment, work patterns, backgrounds, areas of expertise, courses previously taught, and course offerings in the appropriate academic term, among other factors. (*See e.g.* Dep. Ex. 4, "Adjunct Scheduling Preference Form.")

Because it is not immediately apparent that all of the putative class members can even state a claim for damages under 42 U.S.C. § 1983 or Art. XIII, § 5 of the Illinois Constitution, based on the College's decision, Dayton's claims lack commonality with those of the putative class members. Even if the court determines whether the College's decision violated the stated provisions, it would be impossible to resolve the issues central to the validity of each of the claims

17

"in one stroke," as required by the Supreme Court. As a result, Dayton's motion for class certification fails.

### 3. Dayton fails to establish that his claims are typical of those common to the class.

A claim is typical if it "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and ... [her] claims are based on the same legal theory." *Oshana*, 472 F.3d at 513; *citing Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir.1992). Even though some factual variations may not defeat typicality, the requirement is meant to ensure that the named representative's claims "'have the same essential characteristics as the claims of the class at large.'" *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 597 (7th Cir.1993) (*quoting De La Fuente v. Stokely–Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir.1983)).

In *Oshana*, the Seventh Circuit found that the District Court did not abuse its discretion by denying class certification where it determined that plaintiffs' claims for unjust enrichment and violation of Illinois Consumer Fraud and Deceptive Practices Act ("ICFA") were not typical of the putative class. 472 F.3d at 513. Plaintiff claimed that she was deceived by Coca-Cola that its diet products contained artificial sweeteners. *Id.* at 514. The putative class members included individuals who knew that the diet products contained artificial sweeteners, and bought it anyway. *Id.* at 514. As a result, the District Court found that countless members of the plaintiff's putative class could not show any damage, let alone actual damage proximately caused by Coke's alleged deception. *Id.* Plaintiff's claim thus lacked both typicality and commonality with those of countless other putative class members. *Id.*

Similarly, here, Dayton's claims lack typicality with those of the putative class members. Dayton's claims are premised upon the assertion that he is entitled to actual damages, because, but for the College's decision to no longer employ SURS annuitants, he would continue to be employed by the College. As discussed, there is no guarantee that any of the putative class members are entitled to actual damages. In order to determine whether each putative class

member would currently be employed by the College, but for its decision to no longer employ SURS annuitants, the Court must engage in an individualized assessment of each putative class member's claims.

Furthermore, when determining whether typicality exists, the Seventh Circuit considers the respective strengths or weaknesses of the claims of the putative class members. *See e.g. Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 824 (7th Cir. 2011) (finding a lack of typicality and upholding denial of a motion to intervene, where plaintiffs who sought to intervene in class action, possessed claims which were "significantly weaker than those of some (perhaps many) other class members"). Here, Dayton and the putative class members' claims lack typicality because certain class members undoubtedly have competing interests in continued employment with the College, based upon preferential course assignments, and the varying degrees of risk associated with potential continued employment of each SURS annuitant part-time or adjunct faculty member.

As stated, some putative class members may assert that their annuities are so high that it would be impossible to become an affected annuitant, based upon the course assignment limitations in the CBA. (*See* Dayton's Brief in Support, p. 6.) Other putative class members may assert that they could never become an affected annuitant because their annuities are fall within the $10,000.00 statutory exemption. (*See* Dayton's Brief in Support, p. 7.) Still other putative class members have annuities and earnings that in fact, are significantly more likely to expose the College to the risk of employing "affected" annuitants. As in *Randall*, these facts support that the putative class members have competing interests in establishing that they are able to state a claim for damages, and thus, do not constitute an appropriate class.

### 4. Dayton cannot fairly or adequately protect the interests of the putative class members.

As stated by the Seventh Circuit in *Randall*, the "usual practical significance of lack of typicality [...] is that it undermines the adequacy of the named plaintiff as a representative of the

entire class." *Id.* Furthermore, the Supreme Court has held that adequacy is undermined by the existence of "intra-class" conflicts of interest implicit where some plaintiffs have weaker claims to damages than others. *See Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 624 (1997).

In *Randall*, the Court found that the named plaintiff could not adequately represent the entire class where some putative class members held decision-making authority over other class members, and in fact, may have participated in decisions which some of the putative class members believed to be discriminatory. 637 F.3d 818 at 824. The Court noted that "a class representative's conflict of interest is an independent ground for denial of class certification." *Id.*

Similarly, here, some putative class members are likely to have competing interests with respect to establishing a claim to damages, based on the methods by which course assignments are made to adjunct and part-time faculty, and the varying degrees of ease by which the employment of each annuitant may be monitored and continued. As discussed, Dayton's claim to damages is based upon the assertion that, but for the College's decision to no longer employ SURS annuitants, his employment would continue. This assertion is, in turn, based upon the presumption that Dayton would continue to receive course assignments. If, however, Dayton continues to receive course assignments based on order of preference, his continued employment with the College could equate to no course assignments made to certain other putative class members. Dayton has thus failed to establish that by pursuing his own claim for damages, he is adequately representing the potential claims of his putative class members.

Based on the above, Dayton fails to meet the standard for class certification under FRCP 23(a). His motion should thus be denied.

### B.     Dayton cannot establish the predominance requirement of FRCP 23(b)(3).

Dayton seeks certification under FRCP 23(b)(3), "which requires a court to find that 'the questions of law or fact common to class members predominate over any questions affecting only individual members.'" *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). "Rule 23(b)(3)'s predominance criterion is even more demanding that Rule 23(a)." *Id.* The Supreme Court has

held that a class is improperly certified where "questions of individual damage calculations will inevitably overwhelm questions common to the class." *Id.* at 1432-33. "[A] model purporting to serve as evidence of damages in this class action must measure only those damages attributable to" the alleged theory of liability. *Id.* at 1433 (holding that the Third Circuit erred by refusing to entertain arguments against respondents' damages model that bore on the propriety of class certification, and that the respondents' damages model in fact fell short of establishing that damages were capable of measurement on a class-wide basis).

Dayton fails to propose any method for calculating individual damages. Furthermore, there is no damages model that could be appropriately applied on a class-wide basis because there is no guarantee that any of the putative class members are entitled to damages. In order to determine the damages of each putative class member, the Court must engage in an individualized assessment of each putative class member's claims, which would include examination of various factors described herein. As a result, class certification is inappropriate because questions of individual damage calculations will inevitably overwhelm questions common to the class. Dayton's motion should thus be denied. [2]

## **CONCLUSION**

Dayton's motion for class and collective action certification should be denied in its entirety. His motion fails under both § 216(b) and FRCP 23, because in essence, Dayton cannot establish that the putative class members are similarly situated enough so that collective or class action certification will permit the Court to address their claims "in one stroke."

---

[2] The Defendants note that this Court has expressed concern about denying class action certification based upon the lack of a proper damages model, due to the Seventh Circuit's partial remand in the case *Arreola v. Godinez*, 546 F.3d 788, 797 (7th Cir. 2008). The Defendants assert that, in *Arreola*, the Seventh Circuit merely stated that, "our only point here is that the need for individual damages determinations does not, in and of itself require denial of [his] motion for certification", but did not preclude this as a basis for denial of class certification. *See Id.* at 801. Furthermore, Defendants assert that in light of recent Supreme Court holdings such as *Comcast*, it is in fact, necessary for the Court to consider the appropriateness of a class-wide damages model when deciding whether the requirements of FRCP 23(b)(3) have been met. *See* 133 S. Ct. 1426, 1432-33.

As a result, Dayton cannot adequately protect the interests of all putative class members, and the Court should therefore deny and dismiss Dayton's motion for class and collective action certification.

Respectfully submitted,

OAKTON COMMUNITY COLLEGE, MARGARET B. LEE, JOIANNE SMITH, MICHAEL ANTHONY, KARL BROOKS, MAYA EVANS, TOM HAMEL, COLETTE HANDS, BONNIE LUCAS and MUM MARTENS

By: /s/ Jennifer L. Jones
    One of Their Attorneys

Frank B. Garrett III (6192555) (fgarrett@robbins-schwartz.com)
Philip H. Gerner III (3127953) (pgerner@robbins-schwartz.com)
Jennifer L. Jones (6309353) (jjones@robbinws-schwartz.com)
ROBBINS SCHWARTZ NICHOLAS
  LIFTON & TAYLOR, LTD.
55 West Monroe Street, Suite 800
Chicago, Illinois 60603
(312) 332-7760
(312) 332-7768 (Fax)

**CERTIFICATE OF SERVICE**

I hereby certify that on the 28th day of March, 2017, I filed the foregoing Response in Opposition to Plaintiff Dayton's Motion for Class and Collective Action Certification, by uploading same to the ECF system, which constitutes service on all counsel of record.


/s/ Jennifer L. Jones
One of Defendants' Attorneys