IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BARRY H. DAYTON, individually and on behalf of others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 16 C 6812 |
| OAKTON COMMUNITY COLLEGE, MARGARET LEE, JOIANNE SMITH, MICHAEL ANTHONY, KARL BROOKS, MAYA EVANS, TOM HAMEL, COLETTE HANDS, BONNIE LUCAS, and MUM MARTENS, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

In November 2014, Defendant Oakton Community College announced that, as of July 1, 2015, it would no longer employ annuitants of a pension plan referred to as the State Universities Retirement System (SURS). Plaintiff Barry Dayton, a former part-time faculty member at Oakton, was one of the employees affected by the announced policy. He has sued Oakton, on behalf of himself and a proposed class of similarly situated part-time and adjunct faculty of the college, alleging that the implementation of the policy violates the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 623, as well as 42 U.S.C. § 1983 and section 5 of Article XII of the Illinois Constitution. Dayton has named the following individuals as defendants, in addition to Oakton: Margaret Lee, Oakton's president at the time the policy was enacted; Joianne Smith, Oakton's current president and member of the president's advisory council at the time

1

the policy was enacted; and Michael Anthony, Karl Brooks, Maya Evans, Tom Hamel, Collette Hand, Bonnie Lucas, and Mum Martens, the other members of Lee's advisory council at the time the policy was enacted. Two other employees affected by the policy have filed individual suits against Oakland, and their cases have been consolidated with this one.

Dayton has moved for collective certification of his ADEA claims under 29 U.S.C. § 626(b) and for class certification of his other claims under Federal Rule of Civil Procedure 23. Defendants contend that Dayton cannot meet the certification standards under either the ADEA or Rule 23. For the reasons stated below, the Court grants Dayton's motion.

## Background

Oakton is a two-year community college that employs full-time, part-time, and adjunct faculty to teach the courses it offers. Adjunct faculty are those faculty who teach twenty-seven or fewer "lecture hour equivalents" (LHEs) per academic year. They are covered by a collective bargaining agreement (CBA) between the college and the Oakton Community College Adjunct Faculty Association. Faculty who do not work full time and are not covered by the CBA (because, for example, they teach six or fewer LHEs per academic year) are considered "part-time," rather than adjunct, faculty. Neither part-time nor adjunct faculty members are eligible for tenure, and the college retains sole discretion in offering them course assignments on a term-by-term basis. In practice, the deans of individual college divisions, with the assistance of department chairs and coordinators, assign courses to adjunct and part-time faculty after the faculty members submit course request forms. A number of factors determine how courses are

2

assigned, including the courses offered in a given academic term, the qualifications of the faculty requesting courses, priority assignment rights, and department needs. Once adjunct and part-time faculty members receive course assignments, they can earn additional compensation by engaging in other activities at the college, such as tutoring or attending meetings.

SURS is a pension plan that provides retirement benefits to eligible individuals who are or were employed by covered public Illinois state universities or community colleges. Oakton is one of the public community colleges covered by SURS. A number of Oakton's part-time and adjunct faculty members are retirees who previously were employed by Oakton or other covered state universities and began drawing an annuity from SURS upon their retirement.

Illinois law places earnings limitations on SURS annuitants who return to work for a covered college or university after retirement. Illinois' so-called "Return to Work" law prohibits SURS annuitants who retire prior to age 60 from receiving monthly compensation in an amount greater than their monthly base SURS annuity. If the employee does receive compensation greater than the amount of the monthly annuity, the employee is not entitled to the portion of the annuity provided by employer contributions for that month. *See* 40 Ill. Comp. Stat. 5/15-139(b). An annuitant who retires at age 60 or over is limited to earning compensation that, when combined with his or her annual retirement annuity, does not exceed his or her highest annual earnings prior to retirement. *Id.* If an annuitant's compensation is greater than the difference between his or her highest annual earnings prior to retirement and his or her annual retirement annuity, the portion of the monthly retirement annuity provided by employer

3

contributions is reduced by the amount that the compensation exceeds that difference. *Id.* In 2012, Illinois amended the Return to Work law to place additional earnings limitations on SURS annuitants who return to work for covered colleges and universities. Under the amended law, an employer must pay a financial penalty to SURS if the employer employs an "affected annuitant" after August 1, 2013. *See id.* § 15-139.5. An affected annuitant is any SURS annuitant who (1) returns to work for a covered college or university and earns compensation in excess of 40% of his or her highest annual earnings prior to retirement and (2) receives an annualized SURS annuity of at least $10,000.[1] *Id.* § 15-139.5(b). The law obligates employers to determine whether its employees are affected annuitants.

Following passage of the amended Return to Work law, Oakton decided that it would not re-employ any SURS annuitants who became affected annuitants under the law so that it could avoid paying the penalty for employing affected annuitants. Oakton's human resources department monitored the employment and earnings of the SURS-annuitant employees to ensure that none of the annuitants it employed had exceeded the 40% earnings limitation. According to Oakton, the monitoring process was burdensome, and despite the efforts of the human resources department, the college inadvertently employed three affected annuitants after September 1, 2014. As a result of employing the affected annuitants, Oakton was assessed a penalty of approximately $75,000. After Lee, who was Oakton's president at the time, learned that the college would be assessed the penalty, she met with her advisory council. Lee and

---

[1] A person becomes an affected annuitant on the first day of the academic year following the academic year in which he or she meets affected-annuitant conditions. Any person who becomes an affected annuitant remains an affected annuitant unless he or she returns to active service and ceases receiving a SURS annuity. *See* 40 Ill. Comp. Stat. 5/15-139.5(b).

4

the council members determined that, effective July 1, 2015, the college would no longer employ SURS annuitants, whether they were "affected" or not.  Martens, the college's executive director of human resources, announced the college's decision on November 13, 2014 in an e-mail to all SURS annuitants who worked for the college.  According to Oakton, the new policy would not only prevent the assessment of penalties for employing affected annuitants but would also eliminate the burden of monitoring all annuitants to determine which ones were "affected."  Approximately 79 faculty and staff members became ineligible for employment at Oakton as a result of the college's decision.

It is undisputed that Oakton's decision not to employ SURS annuitants after July 1, 2015 was not based on any annuitant's job performance, class schedule, or availability to teach classes.  Rather, the decision not to re-employ SURS annuitants was based on their status as SURS annuitants.  According to Dayton, Lee and the advisory council members knew that numerous adjunct and part-time faculty members who were SURS annuitants could never become "affected" annuitants due to caps on adjunct compensation and on the number of LHEs adjunct faculty members could teach but nonetheless determined not to re-employ any SURS annuitants at all.

Dayton asserts that defendants' decision to terminate the annuitants' employment because of their status as annuitants violated the ADEA and the Illinois Constitution.  He has moved to certify the following group as an ADEA collective class and Rule 23 class:  "All part time and adjunct faculty who were denied employment at Oakton Community College as the result of its policy to not employ or re-employ State Universities Retirement System annuitants and who are not 'affected annuitants'

5

pursuant to 40 ILCS 5/15-139.5(b)(2)." Pl.'s Br. in Supp. of Class Certif. at 1. Defendants maintain that class certification would be inappropriate because each purported class member's claim is different from the claims of other class members and requires individualized assessment.

## Discussion

**A.      Legal standards**

The ADEA authorizes plaintiffs to bring enforcement actions using the procedures provided in the Fair Labor Standards Act, 29 U.S.C. § 216.  *See* 29 U.S.C. § 626(b).  Under the FLSA, an employee may bring a so-called "collective action" against any employer on behalf of himself "and other employees similarly situated." *Id.* § 216(b).  As the Seventh Circuit has explained, the only significant difference between a collective action and a Rule 23 class action "is that in a collective action the members of the class (of the 'collective') must opt into the suit to be bound by the judgment or settlement in it, while in a class action governed by Rule 23(b)(3) (a class action seeking damages) they must opt out *not* to be bound." *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 771 (7th Cir. 2013).  Although the Seventh Circuit has not specified the standard that governs certification of a collective action under the FLSA or ADEA, the court has noted that there is no "good reason to have different standards for the certification of the two different types of action" and that "the case law has largely merged the standards, though with some terminological differences." *Id.* at 772.

Class certification under Rule 23 is appropriate if the plaintiff seeking certification meets all the requirements of Rule 23(a) and his case falls within at least one of the categories identified in Rule 23(b).  *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir.

2008). A purported class satisfies the requirements of Rule 23(a) if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defense of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). In this case, Dayton maintains that the purported class meets the requirements of Rule 23(b)(3), which requires questions of law or fact common among class members to predominate over questions affecting only individual members. *See* Fed. R. Civ. P. 23(b)(3). An additional requirement for class certification is that the proposed class be defined clearly and by objective criteria. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015).

Though the Seventh Circuit has indicated that the standards for certification of a collective action and a class action are similar, the FLSA, unlike Rule 23, does not specify requirements that must be met for certification. The parties in this case, however, appear to agree that a court should consider the following factors when deciding whether to certify a collective action: "(1) whether the plaintiffs share similar or disparate factual and employment settings; (2) whether the various affirmative defenses available to the defendant would have to be individually applied to each plaintiff; and (3) fairness and procedural concerns." *Strait v. Belcan Eng'g Grp., Inc.*, 911 F. Supp. 2d 709, 718 (N.D. Ill. 2012) (St. Eve, J.) (also noting that "majority of courts" have adopted this analysis when considering certification of collective actions).

**B.     Certification of collective action for ADEA claims**

Dayton asserts that Oakton's decision not to employ SURS annuitants violated

7

the ADEA because the decision had a disparate impact on older faculty. "A disparate impact claim exists when an employer has adopted a particular employment practice that, although neutral on its face, disproportionally and negatively impacts" members of a protected class. *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1067 (7th Cir. 2003). Dayton seeks to certify a collective action for plaintiffs' disparate-impact claims.

     Defendants argue that certification is inappropriate because the putative class members are not similarly situated. Specifically, defendants emphasize that part-time and adjunct faculty members do not have rights to continued employment with the college and that the college offers assignments to faculty members on the basis of individualized factors such as the courses they have taught in the past, the current course offerings at the time of assignment, faculty priority rights, and a particular faculty member's annuity size. Defendants argue that members of the putative class can only sustain a claim under the ADEA if they can show that they would have been employed at the college but for the college's decision not to employ SURS annuitants. But, according to defendants, that showing would have to be made on a case-by-case basis because of the college's individualized basis for assigning courses. Similarly, defendants argue that because the putative class members had different levels of earnings and annuity payments, their risk of becoming "affected" annuitants differed. As a result, according to defendants, individualized inquiries will be necessary to determine whether each plaintiff is appropriately considered a member of the putative class, the definition of which excludes affected annuitants.

     Despite defendants' arguments to the contrary, the Court concludes that the putative class members share sufficiently similar factual and employment settings to

8

justify a collective action. Though their likelihood of being assigned courses, and the number of courses they might be assigned, might differ, it is undisputed that Oakton's decision not to employ SURS annuitants was made on a college-wide basis and was not based on any particular annuitant's individual circumstances such as his or her job performance, class schedule, or availability to teach classes. Thus the questions of whether the college's decision had a disparate impact on older faculty and whether this violated the ADEA are questions common to each class member's claims. In addition to being subject to the same college-wide employment action, each member of the proposed class shares a similar employment setting, as each is a non-affected SURS annuitant whose wages, hours, and employment conditions were set forth in the same collective bargaining agreement.

The fact that the proposed class members' individual circumstances made them more or less likely to become "affected" or to be assigned courses is irrelevant on the question of class certification, because it is undisputed that the decision not to employ SURS annuitants was not based on any particular annuitant's likelihood to become affected or to be assigned courses. An employee who suffers discrimination when he or she is denied the renewal of an employment contract can assert a claim under the ADEA, even if that employee is untenured and lacks any prior contractual right to continued employment. *See Leibowitz v. Cornell Univ.*, 584 F.3d 487, 501 (2d Cir. 2009). "The mere fact that the employer's decision not to renew is completely discretionary does not mean that it is not an 'adverse' employment decision." *Id.* The proposed class members may be entitled to different amounts of damages based on their individual circumstances, an issue the Court addresses below. But because the

9

alleged decision not to employ SURS annuitants constitutes an adverse employment action in itself, each proposed class member is similarly situated with respect to defendants' liability, regardless of differences in the damages to which each plaintiff may be entitled. *Cf. Arreola*, 546 F.3d at 801 (need for individual damages determinations does not, in and of itself, require denial of motion for class certification).

C. **Certification of Rule 23 class action for claims under Illinois Constitution and section 1983**

Dayton also asserts a claim under 42 U.S.C. § 1983, contending that Oakton's decision not to employ any SURS annuitants deprived him and the purported class members of rights, privileges, or immunities secured by the ADEA and that to the extent Oakton's decision is authorized by 40 Ill. Comp. Stat. 5/15-139.5(b)(2), the state statute is preempted by the ADEA's prohibition against discrimination. In addition, Dayton alleges that Oakton's decision violates the Illinois Constitution, which provides that "[m]embership in any pension or retirement system of the State, any unit of local government or school district, or any agency or instrumentality thereof, shall be an enforceable contractual relationship, the benefits of which shall not be diminished or impaired." Ill. Const. art. XIII, § 5. For these claims, Dayton seeks certification of a class under Rule 23. In response, defendants argue that the proposed class is insufficiently definite, the putative class members' claims lack commonality, Dayton's claims are not typical of those that are common to the class, and Dayton cannot fairly and adequately protect the interests of the other class members. Defendants also contend that Dayton is unable to satisfy Rule 23(b)(3)'s predominance requirement because "questions of individual damage calculations will inevitably overwhelm questions common to the class." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433,

185 L. Ed. 2d 515 (2013).

### 1. Definiteness of class

Defendants argue that the proposed class of faculty members who were denied "as the result of [Oakton's] policy" is insufficiently definite because adjunct and part-time faculty had no guaranteed right to employment with the college, making it impossible to determine, without an individualized inquiry, which individuals would have been employed by the college but for Oakton's decision not to employ SURS annuitants. *See Jamie S*, 668 F.3d at 496–97 (proposed class of unidentified disabled students "potentially eligible" for special-education services "inherently too indefinite to be certified"). The Court disagrees with defendants that the proposed class is "fatally indefinite." On the contrary, plaintiffs have identified a list of college employees affected by the college's decision not to employ SURS annuitants, and Martens agreed during her deposition that the "decision not to employee the individuals that we see on [that list] was solely based on the fact that they were receiving an annuity from SURS." Martens Dep., dkt. no. 37-7, 90: 7–14. Thus it is not, as defendants argue, impossible to identify which faculty members are eligible; Dayton has already identified them. In addition to those non-affected annuitants on the list, the class is also open to those SURS annuitants who applied for adjunct or part-time faculty positions after July 1, 2015 and were rejected for positions because of their annuitant status. That group, too, is sufficiently definite, as the college's allegedly discriminatory policy would bar their employment whether or not the college would have other reasons to deny them employment, and their status as denied applicants makes them easily identifiable.

### 2. Commonality

Defendants also argue that Rule 23(a)'s commonality requirement is not satisfied because the issue of whether each proposed class member would continue to receive course assignments, and can thus assert a claim for damages, depends upon individualized circumstances. But as discussed above, each proposed class member can assert a claim on the basis of the college's allegedly discriminatory employment action. Plaintiffs do not "wish to sue about literally millions of employment decisions at once." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 352 (2011). Rather, their claims concern a single decision applied college-wide. Thus each of the proposed class members "suffered the same injury," irrespective of the damages to which each member might be entitled, and the determination of whether the college's decision that resulted in their injury violated the ADEA or the Illinois Constitution may be determined "in one stroke." *Id.* at 350. Each plaintiff alleges the same injury based on the same alleged violation of the law, and their claims are thus clearly capable of class-wide resolution.

### 3. Typicality

Defendants contend that Dayton's claims are not typical of those of proposed class members because each putative class member's entitlement to damages will depend upon his or her individual circumstances. As the Court discussed above, however, though the putative class members' damages might be different, the defendants' liability to each of them is based on the same alleged employment practice. A named plaintiff's claim is typical "if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and [his] claims are

based on the same legal theory." *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006). The Court is satisfied that Dayton's claims have the same "essential characteristics as the claims of the class at large," *id.*, even if the putative class members suffered varying degrees of harm.

### 4. Fair and adequate representation

According to defendants, Dayton cannot fairly and adequately represent the class members because the class members are likely to have competing interests. Specifically, defendants contend that each class member is likely to argue that his or her particular circumstances would warrant greater course assignments (and thus greater damages resulting from the alleged discrimination) than the circumstances of other class members. Defendants have not suggested, however, that Dayton's claims are "idiosyncratic or possibly unique." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 758 (7th Cir. 2014). This is not a case, for example, where some putative class members hold decision-making authority over others, *cf. Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 824 (7th Cir. 2011), or where the viability of each plaintiff's claims depends upon his or her subjective experience, *Suchanek*, 764 F.3d at 758. Rather, each putative class member occupied the same tier of employment, and the injury Dayton has alleged is "the same injury [suffered by] members of the proposed class." *Id.* Dayton is thus capable of providing fair and adequate representation. The Court addresses below the possibility that the class members have diverging interests on the issue of damages.

### 5. Predominance of common questions of law and fact

Defendants argue that Dayton cannot satisfy Rule 23(b)(3)'s predominance

13

requirement because "questions of individual damage calculations will inevitably overwhelm questions common to the class." *Comcast*, 133 S. Ct. at 1433. "This case[, however,] presents a vastly different situation from *Comcast*, where the proposed class had two million people and a far more complex allegation of harm." *Fox v. Riverview Realty Partners*, No. 12 C 9350, 2014 WL 1613022, at *6 (N.D. Ill. Apr. 22, 2014) (Kennelly, J.). Unlike the complex inquiry into the antitrust impact felt by various plaintiffs in *Comcast*, the calculation of damages in this case appears unlikely to be overly complicated. As Dayton points out, each putative class member's prior course load and wage rate can be easily identified, and the collective bargaining agreement determines the applicable wage rate for each LHE a class member would teach. Thus, unless defendants present evidence to the contrary, class members' prior course loads should provide a reasonably accurate guide to the damages plaintiffs suffered when they were denied future employment. The damages calculation certainly does not appear so complex that the cost of determining damages on a class-wide basis outweighs the benefits of class litigation on the issue of Oakton's liability for its single, discrete employment policy. Should it appear, at a later stage, that damages determinations will require more complicated, individualized treatment, the Court is confident that there will be adequate means to address that issue within the larger class action. *See Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) ("If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification."); *see also* Fed. R. Civ. P. 23(c)(1)(C)

(order certifying class may be amended before final judgment); *id.* 23(c)(4) (authorizing certification of a class "with respect to particular issues," e.g. liability only).

## Conclusion

For the reasons stated above, the Court grants Dayton's motion for collective and class certification [dkt no. 35]. The Court certifies a class consisting of "all part-time and adjunct faculty who were denied employment at Oakton Community College as the result of its policy not to employ or re-employ State Universities Retirement System annuitants and who are not 'affected annuitants' pursuant to 40 ILCS 5/15-139.5(b)(2)" and appoints Nathan D. Eisenberg, Sara J. Geenen, and Erin F. Medeiros, and Stephen Yokich to represent the class. Dayton has also moved for approval of his proposed notice to class members. Defendants have not objected to the proposed notice, and the Court approves the notice Dayton has proposed, except that the word "promulgated," where used, should be changed to "established" to make it more readily understandable. Class counsel are directed to immediately communicate the Court's decision to counsel for the plaintiffs in the two consolidated individual suits. The case remains set for a status hearing on Monday, May 22, 2017 at 9:30 a.m. to set a schedule for further proceedings.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: May 17, 2017